IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SUNGARD RECOVERY SERVICES L.P.,** : | |
| **a limited partnership, formerly known as** : | |
| **SunGard Recovery Services Inc.** : | |
| **1285 Drummers Lane** : | |
| **Wayne, Pennsylvania 19087,** : | |
| : | |
| **Plaintiff,** : | |
| : | **Civil Action No. 02-CV-4445 (MK)** |
| **v.** : | |
| : | |
| **DELTANET, INC.** : | |
| **a California Corporation,** : | |
| **100 First Street, Suite 2100** : | |
| **San Francisco, California 94105,** : | |
| : | |
| **Defendant.** : | |

## FIRST AMENDED COMPLAINT

Plaintiff SunGard Recovery Services LP, formerly known as SunGard Recovery Services Inc., by and through its undersigned counsel, files this Complaint against Defendant Deltanet, Inc., and in support thereof avers as follows:

## THE PARTIES

1.      Plaintiff SunGard Recovery Services LP, formerly known as SunGard Recovery Services Inc. ("SunGard" or "Plaintiff"), is a limited partnership with its principal place of business located at 1285 Drummers Lane, Wayne, Pennsylvania 19087. The members of SunGard are SunGard Computer Services Inc., a Pennsylvania corporation with its principal place of business in Voorhees, New Jersey, and SunGard Partner L.L.C., a

-1-

limited liability company.    The sole member of SunGard Partner L.L.C. is SunGard Computer Services Inc.

2.    Defendant Deltanet, Inc. ("Deltanet") is a California corporation with its principal place of business at 100 First Street, San Francisco, California 94105.  Deltanet is registered to do business in the Commonwealth of Pennsylvania and has offices located in Mechanicsburg, Pennsylvania.

### VENUE

3.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that it is between citizens of different States and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

4.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(a)(2) and 1391(c).

### FACTUAL BACKGROUND

**A.    The Recovery Services Agreement and Its Addenda.**

5.    SunGard specializes in providing computer-related disaster recovery services. Such services enable a computer-dependent company to prepare for and maintain its operations during times of emergency, such as fire, flood or power loss.  SunGard provides backup computer systems and establishes backup communications networks through which the customer can access the backup computer facility from various sites.

6.    Deltanet is a privately held company and a subsidiary of Delta Dental Plan of California.  Deltanet describes itself as "the dominant information technology partner of Delta Dental Plans."   Its primary business is to provide administrative systems for the

processing of claims for Delta Dental Plans which cover approximately 39 million subscribers throughout the United States.

7.    Deltanet provides such services to, among others, Delta Dental of Pennsylvania, which provides dental insurance for approximately 1.9 million insureds in Pennsylvania, including (among others) hundreds of SunGard employees in this district, as well as state and local government employees in this district. As a regular part of its business Deltanet provides processing and data services for claims submitted by and on behalf of insureds and dental care providers in this district.

8.    Effective May 15, 1999, SunGard, then known as SunGard Recovery Services Inc., and Deltanet entered into a Recovery Services Agreement, a "Schedule A" and Addenda thereto (collectively, the "Agreement") that identified the services selected by Deltanet for its facilities in Rancho Cordova, California the initial monthly fees, and the initial term of the Schedule commencing on May 15, 1999 and lasting 63 months. A true and accurate copy of the Agreement is attached hereto as Exhibit A.

9.    On or about January 1, 2001, through a statutory merger and consolidation, the Agreement was transferred by operation of law from SunGard Recovery Services Inc. to SunGard Recovery Services LP.

10.    Among the services SunGard agreed to provide Deltanet in the event that it was rendered unable to use its own data processing equipment were the following:

> • Assistance of SunGard's Support Staff consisting of systems software, telecommunications, operations and customer support personnel on an as needed basis whenever a Disaster is declared (id. at § A(4));

- Assistance during a disaster in obtaining and installing additional and/or replacement hardware (id.); and

- Access to SunGard's facilities for testing its disaster recovery capability (id. at § A(5)).

11.    In exchange for these services, Deltanet agreed to pay SunGard Monthly Fees for the duration of the Agreement.

12.    The Agreement further provided for termination upon notice at the end of an Agreed Term:

> **Contract Term.** This Agreement shall continue in effect for so long as there is a Schedule in effect. The term of a Schedule, and Subscriber's rights to use the Recovery Services selected on that Schedule, shall begin on the Commencement Date and continue in effect for the Agreed Term stated in that Schedule. Thereafter, that Schedule shall automatically renew for successive one-year renewal terms at the then current one-year rate, unless either party gives written notice of termination to the other at least ninety (90) days before the end of the then current term.

Agreement at § D(1) and "Addendum to Recovery Services Agreement Dated May 15, 1999, executed on June 8 and June 10, 1999, at ¶ 1.

13.    The Agreement further provided for future increases in the Monthly Fees:

> . . . Beginning one year after the Commencement Date of a Schedule, SunGard may increase all fees chargeable under that Schedule by up to 8% per contract year, by giving Subscriber at least 90 days prior written notice.

Id. at § D(2).

14.    The Agreement further contained a force majeure clause:

> Neither party shall be liable for, nor shall either party be considered in breach of this Agreement due to, any failure to perform its oblgiations under this Agreement as a result of a cause beyond its control, including any natural calamity, act of God or a public enemy, act of any

military, civil or regulatory authority, change in any law or regulation, disruption or outage of communications, power or other utility, failure to perform by any supplier or other third party, or other cause which could not have been prevented with reasonable care. If, due to any such cause, SunGard is unable to provide to Subscriber a material part of the Recovery Services described in a Schedule and this inability continues for a period of more than 30 days, then the Monthly Fees for those Recovery Services for that period shall be waived and the term of that Schedule shall be extended by an equal period. If this inability continues for more than three (3) days after Subscriber has declared a Disaster, then Subscriber may terminate that Schedule, without penalty, by giving written notice of termination to SunGard at any time before the inability ends.

Id. at § D(5) and "Addendum to Recovery Services Agreement Dated May 15, 1999, executed on June 8 and June 10, 1999, at ¶ 2.

15.    The Agreement also provided for termination for cause:

If either party breaches any of its obligations under this Agreement in any material respect and the breach is not substantially cured within the cure period specified below, then the other party may terminate this Agreement or any Schedule(s), without penalty, by giving written notice to the breaching party at any time before the breach is substantially cured. With respect to a breach of SunGard's obligation to provide the Recovery Services to Subscriber during a Disaster, the cure period shall be five days. With respect to Subscriber's payment obligations, the cure period shall be ten days after receipt of SunGard's written notice of non-payment. With respect to all other obligations under this Agreement, the cure period shall be 30 days after receipt of written notice describing the breach, provided that, if a longer period is reasonably required to cure the breach and the cure is promptly begun, such cure period shall be extended for as long as the cure is being diligently prosecuted to completion.

Id. at § D(6).

16.    The Agreement further set forth the manner in which the parties were required to provide written notice to each other:

> **NOTICE.** All notices, consents and other communications under this Agreement shall be in writing and shall be deemed to have been received on the earlier of the date of actual receipt or the third business day after being sent by first class mail. Any notice may be given by facsimile, and Disaster declaration notice may be given orally, provided that, in either case, a signed written confirmation is received within 24 hours thereafter. Subscriber's address for notice is stated in each Schedule. SunGard's address for notice is 1285 Drummers Lane, Wayne, Pennsylvania 19087, Attention: Contract Administration.

Id. at § D(7).

17.    The parties further agreed that the Agreement "shall be governed by substantive Pennsylvania law." Id. at § D(10).

18.    The Agreement further provided that "[i]n any action relating to this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and court costs from the other party." Id.

### B.    Activities in this District in Connection With the Agreement.

19.    On or about July 15, 1999, Beth Lynn Rich, Vice President of SunGard's Contract Administration department in Wayne, Pennsylvania, wrote to Deltanet to provide clarification about the contract documentation, and asked Deltanet to counter-sign the letter and return it to her office to acknowledge receipt of the clarification.

20.    By letter dated September 13, 1999, Bill Thomas, Vice President of Deltanet's Computer Services department, wrote to Denise MacLeod – SunGard's Director of Contract Administration in Wayne, Pennsylvania – to provide certifications "required under SunGard's disaster declaration policy" relating to Deltanet's preparation for any "Y2K" failures.

21.     On three separate occasions, Deltanet conducted tests of the disaster recovery services by remote access of, and communications with personnel located at, SunGard's facilities in Philadelphia, Pennsylvania.   Prior to each such test, Deltanet personnel engaged in lengthy communications and pre-test planning with SunGard personnel in Philadelphia, including the exchange of written correspondence and email. Further, SunGard personnel from Philadelphia participated in a number of planning meetings with Deltanet personnel, and Deltanet completed test plans, prior to each such test, that were provided to SunGard's Philadelphia staff. At all times, Deltanet was aware that the equipment to be used during its tests was located in and utilized at SunGard's test facilities in Philadelphia, Pennsylvania, and SunGard provided its test services to Deltanet in Philadelphia.

22.     By letter dated May 30, 2000, Deltanet informed SunGard's Contract Administration office in Wayne, Pennsylvania, that it believed the Agreement was terminated for cause effective July 31, 2000.  A true and accurate copy of the May 30, 2000 Letter is attached hereto as Exhibit B.  On information and belief, the date stated on the face of the letter as May 30, 1999 is a typographical error.

23.     Among the reasons stated for the termination were purported problems associated with the tests conducted between California and SunGard's facilities in Philadelphia, Pennsylvania, including but not limited to connection failures caused by a third-party provider which made it difficult for Deltanet to access services and hardware in Philadelphia, and purported inadequacies in the hardware and services provided by SunGard in Philadelphia.

24.    Prior to the May 30, 2000 letter, Deltanet had given no written notice of material breach or opportunity to cure in accordance with §§ D(6)-(7) of the Agreement.

25.    Further, the May 30, 2000 letter did not extend an opportunity to cure to SunGard. Id.

26.    By letter June 26, 2000, SunGard, from its Wayne, Pennsylvania offices, informed Deltanet that its purported cancellation was not in compliance with the terms of the Agreement and that Deltanet remained liable for Monthly Fees through the end of the current Term of the Agreement, which is scheduled to end August 14, 2004. A true and accurate copy of the June 26, 2000 Letter is attached hereto as Exhibit C.

27.    By letter dated October 26, 2000 and addressed to SunGard's Wayne, Pennsylvania offices, Deltanet responded to the June 26, 2000 Letter.

28.    Subsequently, SunGard's in-house counsel in Wayne, Pennsylvania, and Deltanet's in-house in San Francisco continued to exchange correspondence regarding Deltanet's attempts to terminate the Agreement and its failure to pay the invoices issued from SunGard's Wayne, Pennsylvania offices.

C.    **Deltanet's Failure to Pay SunGard's Monthly Fees.**

29.    Deltanet was not entitled to terminate the Agreement under § D(1) except by three-months written notice effective upon the expiration of the Agreed Term in effect at the time.

30.    Deltanet was not entitled to terminate the Agreement under any other provision thereunder.

-8-

31.    Under the terms of the Agreement, Deltanet is required to pay SunGard Monthly Fees for services through August 14, 2004. Despite repeated demands from SunGard, Deltanet has made no payments on its Monthly Fees since September 26, 2000. These fees are calculated as follows:

| Time Period | Rate | No. of Months | Total |
|---|---|---|---|
| 11/01/00 - 07/31/01 | 2,000.00 | 9 | 18,000.00 |
| 08/01/01 - 07/31/02 | 11,400.00 | 12 | 136,800.00 |
| 08/01/02 - 07/31/03 | 11,970.00 | 12 | 143,640.00 |
| 08/01/03 - 08/15/04 | 12,570.00 | 12.5 | 156,938.00 |
| | | Total: | $455,378.00 |

## COUNT I - BREACH OF CONTRACT

32.    SunGard incorporates paragraphs 1 through 31 of the Complaint.

33.    As described herein, there is a valid and binding contract between SunGard and Deltanet.

34.    SunGard has fulfilled and is ready, willing and able to continue to fulfill its obligations to Deltanet under the Agreement.

35.    Deltanet has breached the Agreement by failing to make prompt payment of its Monthly Fees as they accrue and refusing to pay future Monthly Fees as they become due and owing.

36.    SunGard has suffered damages as a direct result of Deltanet's breach of the contract in an amount exceeding $455,378.00, plus interest, costs and attorney's fees.

WHEREFORE, SunGard Recovery Services LP, formerly known as SunGard Recovery Services Inc., requests that this Court enter judgment on Count I in its favor and against Deltanet, Inc., in the amount of $455,378.00, interest, costs, attorney's fees under the Agreement, and such other and further relief as may be just and proper.

## COUNT II - UNJUST ENRICHMENT

37.    SunGard incorporates paragraphs 1 through 31 of the Complaint.

38.    At all relevant times, SunGard provided and continues to provide backup capabilities and other services for Deltanet that were set forth in the Agreement.

39.    Deltanet received and continues to receive the benefit of SunGard's services throughout the course of the parties' dealings, and it is unconscionable for Deltanet to reap these benefits without paying SunGard.

40.    By virtue of its conduct, Deltanet has been and continues to be unjustly enriched at SunGard's expense in an amount exceeding $455,378.00, plus interest, costs and attorney's fees.

-10-

WHEREFORE, SunGard Recovery Services LP, formerly known as SunGard Recovery Services Inc. requests that this Court enter judgment on Count II in its favor and against Deltanet, Inc., in the amount of $455,378.00, plus interest, costs, attorney's fees under the Agreement, and such other and further relief as may be just and proper.

Dated: September 6, 2002            BLANK ROME LLP

_Rebecca D. Ward_

Laurence S. Shtasel, Esq.
Rebecca D. Ward, Esq.
One Logan Square
Philadelphia, PA 19103
Telephone:     (215) 569-5500
Facsimile:     (215) 569-5694

Attorneys for Plaintiff SunGard Recovery Services LP, formerly known as SunGard Recovery Services Inc.

-11-

## CERTIFICATE OF SERVICE

I, Rebecca D. Ward, hereby certify that on September 23, 2002 I caused true and accurate copies of the Stipulation to File First Amended Complaint, and the First Amended Complaint to be placed with FedEx for delivery upon the next business day, addressed as follows:

> Craig J. Staudenmaier, Esq.
> Nauman, Smith, Shissler & Hall LLP
> 200 N. Third Street, 18th Floor
> Harrisburg, PA 17108-0840

Rebecca D. Ward

EXHIBIT A

# RECOVERY SERVICES AGREEMENT

## BETWEEN

## SUNGARD RECOVERY SERVICES INC.

**a Pennsylvania corporation**

## ("SunGard")

## AND
## DELTANET, INC.

a _____ corporation

## ("Subscriber")

## DATED

## May 15, 1999

---

By the signatures of their duly authorized representatives below, SunGard and Subscriber, intending to be legally bound, agree to all of the terms of this Agreement.

**SUNGARD RECOVERY SERVICES INC.**

By: _____

Print: _____JESSE B. ADAMS_____

Print Title: ____SR. VICE PRESIDENT____

Date Signed: ____5/3/99____

**DELTANET, INC.**

By: _____

Print Name: _____Bill Morris_____

Print Title: _____VP_____

Date Signed: ____5/20/99____

A. **RECOVERY SERVICES.** Each Schedule to this Agreement specifies a Subscriber location ("Location"), the recovery services to be provided by SunGard to Subscriber for that Location ("Recovery Services"), the fees to be paid by Subscriber to SunGard for those services, and any other applicable terms. Each Schedule represents a separate contract between the parties that incorporates and is governed by all of the terms of this Agreement.

1. **DISASTER.** A "Disaster" is any unplanned event or condition that renders Subscriber unable to use a Location for its intended computer processing and related purposes. By signing a Schedule or any Addendum to a Schedule, Subscriber warrants that the Location specified in that Schedule is not at that time experiencing a Disaster.   Subscriber may declare a Disaster by having one of its designated representatives give notice to SunGard stating that a Disaster occurred, identifying the affected Location, specifying which Recovery Services Subscriber believes will be required, and naming another designated representative whom SunGard may immediately contact to verify the Disaster.

---

*THE TERMS OF THIS AGREEMENT ARE CONFIDENTIAL.*

Recovery Services to be provided by SunGard to Subscriber shall be the following services (as described below) described in the applicable Schedule:

(a) **Center-Based Recovery Services.** Immediate and exclusive use of the services described below ("Center-Based Recovery Services"), which Subscriber may use during the period of time stated below, provided at a SunGard facility:

(i) **Hotsite.** An installed, fully operational computer system and networking capability ("Hotsite"), equal to or better than (in all material respects including equipment quality and processing capacity) the Hotsite Configuration described in the Schedule, which Subscriber may use for six weeks.

(ii) **Coldsite.** Environmentally prepared computer space ("Coldsite"), properly equipped to facilitate the installation of a computer system comparable to the Hotsite Configuration, which Subscriber may use for six months.

(iii) **Office Space.** An adequate and reasonable amount of office space in the same facility where the Hotsite or Coldsite is located, properly equipped to facilitate the installation of terminals, which Subscriber may use to operate that Hotsite or Coldsite.

(iv) **Work Group Space.** An adequate and reasonable amount of office space, properly equipped to accommodate the Work Group Configuration described in the Schedule, which Subscriber may use for six weeks.

(v) **MegaVoice.** SunGard's voice communications backup service for the number of communications ports stated in the Schedule, which Subscriber may use for six weeks.

(b) **Mobile Recovery Services.** Immediate and exclusive use of the services described below ("Mobile Recovery Services"), which Subscriber may use for the duration of a Disaster:

(i) **Replacement Recovery System.** A fully operational, relocatable computer system and networking capability ("Replacement Recovery System"), equal to or better than (in all material respects including equipment quality and processing capacity) the Mobile Configuration described in the Schedule, to be provided to Subscriber by one of the following methods at Subscriber's option:

   a. **Primary Recovery Facility.** Access to the Replacement Recovery System at a SunGard facility where it is then installed.

   b. **Alternate Recovery Facility.** Delivery of the Replacement Recovery System to a SunGard facility where it may be accommodated, within 48 hours after SunGard receives the Disaster declaration notice.

   c. **Mobile Data Center.** Delivery of a properly equipped vehicle housing the Replacement Recovery System to a destination in the continental United States requested by Subscriber, within 48 hours after SunGard receives the Disaster declaration notice.

   d. **Subscriber Facility.** Delivery of the Replacement Recovery System to a properly equipped facility located in the continental United States requested by Subscriber, within 48 hours after SunGard receives the Disaster declaration notice.

(ii) **Computer Space.** Environmentally prepared computer space ("Computer Space"), properly equipped to facilitate the installation of a computer system comparable to the Mobile Configuration, to be provided to Subscriber by one of the following methods at Subscriber's option:

   a. **SunGard Facility.** Access to the Computer Space at a SunGard facility where the Replacement Recovery System may be accommodated.

   b. **Mobile Coldsite.** Delivery of a properly equipped vehicle housing the Computer Space to a destination in the continental United States requested by Subscriber, within 48 hours after SunGard receives the Disaster declaration notice.

(iii) **Supplemental Office Space.** An adequate and reasonable amount of office space in the same SunGard facility where the Replacement Recovery System or Computer Space is located, properly equipped to facilitate the installation of terminals, which Subscriber may use to operate that Replacement Recovery System or Computer Space.

(iv) **Mobile Work Group Space.** Delivery of a vehicle properly equipped to accommodate the Mobile Work Group

nental United States requested by Subscriber, within 48 hours afte

(v) **Quick Ship Equipment.** Delivery of equipment equal to or better tha (in all material respects including equipment quality and processin capacity) the Quick Ship Equipment described in the Schedule, to properly equipped facility in the continental United States requested o Subscriber, within 48 hours after SunGard receives the Disaster declar tion notice.

3. **EXTENDED USE.** During a Disaster, Subscriber may continue to use th Center-Based Recovery Services beyond the periods stated in Sectio A2(a), provided that this extended use shall be subject to immediate te mination if and when any other subscriber declares a disaster.

4. **COMPREHENSIVE RECOVERY SUPPORT.** Whenever Subscriber use Recovery Services during a Disaster, SunGard's Support Staff (consis ing of operations, communications, security, transportation, system software and customer support personnel, as appropriate) shall provid comprehensive support to Subscriber on a 24-hour-a-day, 7-day-a-wee basis, as needed. To facilitate Subscriber's use of the Recovery Service during a Disaster, SunGard's Support Staff shall assist Subscriber in pre testing Subscriber's operating systems, network control programs an communications circuits. During a Disaster, SunGard's Support Sta also shall assist Subscriber in contacting vendors and in obtaining an installing additional or replacement equipment.

5. **TESTS.** Upon execution of this Agreement, SunGard shall eithe schedule a Workshop with Subscriber at the recovery center or provid Subscriber with a computer based Workshop. Subscriber may use ce tain Recovery Services to test its disaster recovery capability ("Test for the number of Test Periods stated in the applicable Schedule. Eac Test Period entitles Subscriber to eight (8) hours of consecutive tes time per contract year at a designated SunGard facility, on a nor cumulative basis. During each Test, SunGard's Support Staff shall pro vide reasonable supplies and support to Subscriber as needed, subjec to availability. In order for SunGard to provide support to Subscribe for a scheduled Test, all Test plans must be provided to SunGard a least three (3) weeks prior to the Test date. Upon receipt o Subscriber's Test plan, SunGard will then assign a SunGard technica coordinator to review Subscriber's Test plan and act as project manag er to coordinate Test support activities. Tests shall be scheduled a least four (4) months in advance and availability is 7 days x 24 hours All Tests shall be subject to immediate cancellation or termination, an shall be rescheduled as soon as possible, if and when any other sut scriber declares a disaster and requests use of the Recovery Service being tested.

6. **SOFTWARE.** All systems and utility software which SunGard has installe at its facilities may be used by Subscriber during a Disaster or a Test.

7. **TECHNOLOGY EXCHANGE.** Upon Subscriber's request, SunGard wi provide a list of computer and communications equipment that is the currently available to enhance the Hotsite Configuration or Mobil Configuration. Subscriber may exchange certain components of tha configuration for hardware representing newer technology, by givin written notice to SunGard and signing an appropriate Addendum to th applicable Schedule. Upon the effective date of this exchange, th Monthly Fees due under that Schedule may increase by an amount rea sonably determined by SunGard, based upon the difference between (i SunGard's then prevailing Monthly Fees for the new hardware selecte and (b) an allocated portion of the prior Monthly Fees covering the con ponents that were replaced.

8. **ACCOUNT EXECUTIVE.** SunGard shall assign an Account Executive t Subscriber to assist in monitoring the continued viability c Subscriber's disaster recovery capability and to facilitate ongoing con munications between Subscriber and SunGard.

9. **HOTLINE.** SunGard shall maintain a toll-free customer support tel phone service, on a 24-hour-a-day, 7-day-a-week basis, whic Subscriber may use as needed.

10. **USER'S GUIDES.** Subscriber shall receive SunGard's current User Guides for the Recovery Services and all applicable updates and rev sions, as and when issued.

11. **PLANNING SERVICES AND SOFTWARE.** Subscriber may engag SunGard's disaster recovery consultants, at SunGard's then prevailin fees, to prepare and maintain a disaster recovery plan for Subscriber, aud Subscriber's disaster recovery capability, and provide other disaster reco ery planning and consulting services. Subscriber may license SunGarc disaster recovery planning software at SunGard's then prevailing fees.

12. **OTHER SERVICES.** Subscriber may obtain any other recovery service offered by SunGard, at SunGard's then prevailing fees, by executing a appropriate Schedule or Addendum describing such services.

1. **MAINTENANCE.** SunGard shall maintain vendor-specified proper operating environments at its facilities and in its vehicles used to provide the Recovery Services. SunGard shall adhere to vendor-recommended procedures and policies for proper maintenance of the Recovery Resources, including necessary remedial maintenance and regularly scheduled preventive maintenance. **SunGard warrants to Subscriber that the Recovery Resources shall be maintained in a state of readiness at all times, consistent with SunGard's obligations under this Agreement.**

2. **SIGNIFICANT CHANGES.** SunGard may change the Recovery Resources and shall give written notice to Subscriber at least 60 days before making any significant change that might substantially and adversely impact Subscriber. Subscriber shall then have an adequate and reasonable number of free additional Test Periods to Test the affected Recovery Services. If, in Subscriber's reasonable judgment, any such change substantially and adversely impacts Subscriber to the extent that Subscriber cannot use the affected Recovery Services, then Subscriber may terminate the affected Recovery Services by giving written notice to SunGard within ten days after Subscriber first uses the affected Recovery Services for either a Disaster or Test.

3. **AUDITS.** At any time except when the Recovery Resources are being used during a disaster or a confidential test, Subscriber may, at its expense, audit the Recovery Resources to verify SunGard's compliance with this Agreement. SunGard also shall permit any regulatory authority having jurisdiction over Subscriber to inspect the Recovery Resources. SunGard shall, at its expense, have the Recovery Resources annually reviewed by an independent third-party auditor, whose reports shall be furnished to Subscriber upon request.

4. **STANDARD PROCEDURES.** SunGard shall maintain reasonable and uniform rules regarding security, safety, scheduling, operations and other procedures for accessing and using the Recovery Resources during disasters and tests. These rules may appear in SunGard's User's Guides and in other written documents provided by SunGard to its subscribers from time to time. Both SunGard and Subscriber shall comply with these rules in all material respects and shall use all Recovery Resources in accordance with manufacturer specifications. Rules for

Tests may include advance scheduling and cancellation requirements. Any Test Periods cancelled less than 45 days before the scheduled date will be applied against Subscriber's annual allotment of Test Periods.

5. **SPECIAL PROCEDURES.** If Subscriber gives written notice to SunGard describing any special data protection or other security procedures used by Subscriber, then SunGard shall use commercially reasonable efforts to help implement those procedures whenever Subscriber is using the Recovery Resources. Subscriber shall be responsible for any additional expenses reasonably incurred by SunGard in implementing Subscriber's special procedures.

6. **MOBILE RESOURCES.** Title to all of the Recovery Resources used to provide Mobile Recovery Services ("Mobile Resources"), wherever located, shall remain in SunGard or its supplier, except for any Quick Ship Equipment as to which Subscriber properly exercises its purchase option, if any, described in the applicable Schedule. With respect to any Mobile Resources for which the destination is not a SunGard facility, (a) Subscriber shall obtain or provide, at Subscriber's expense, all permits, landlord consents and other authorizations, and all communications, power and other utility lines and equipment needed to possess, locate or use the Mobile Resources at that destination, (b) Subscriber shall be responsible for the security of the Mobile Resources at that destination, (c) Subscriber shall not relocate the Mobile Resources without SunGard's prior written consent which will not be unreasonably withheld, (d) when Subscriber's use or right to use the Mobile Resources during a Disaster or Test ends, Subscriber shall comply with SunGard's return delivery or shipment instructions, and (e) if the Mobile Resources do not include a SunGard vehicle, then Subscriber shall provide a proper operating environment for the Mobile Resources. If any Mobile Resources are provided by a third party under contract with SunGard and that contract is terminated, then SunGard may terminate the applicable Recovery Services upon 90 days prior written notice to Subscriber.

7. **REMARKETED EQUIPMENT.** SunGard may terminate the Recovery Services for any items designated in a Schedule as "Remarketed Equipment" (equipment owned by another SunGard subscriber) upon 30 days prior written notice to Subscriber.

---

**C. MULTIPLE DISASTER.** Subscriber's rights of immediate and exclusive use of the Recovery Resources, as provided in Section A2, shall be subject to the possibility that one or more other subscribers ("other affected subscribers") could declare a disaster and require use of the same Recovery Resources at the same time as Subscriber ("Multiple Disaster").

1. **GENERAL MULTIPLE DISASTER PROCEDURES.** If a Multiple Disaster occurs, then the following procedures shall be implemented with respect to all Recovery Resources other than Mobile Resources:

   (a) Subscriber and the other affected subscribers shall have equal rights of access to and use of the applicable Recovery Resources, irrespective of the order in which disasters occurred or were declared.

   (b) In an effort to avoid the need for shared or allocated use of any Recovery Resources, SunGard shall, to the fullest extent possible under the circumstances, take full advantage of, and provide access to, all of its other available Recovery Resources.

   (c) If shared or allocated use of any Recovery Resources is necessary, then SunGard shall develop and implement an appropriate plan ("Multiple Disaster Plan") providing for the sharing or allocation of those Recovery Resources in a manner reasonably determined by SunGard. If Subscriber and the other affected subscribers unanimously agree upon their own Multiple Disaster Plan, then SunGard shall implement that plan to the fullest extent possible under the circumstances.

   (d) Subscriber shall cooperate with SunGard and the other affected subscribers in coordinating the use of the Recovery Resources and, if necessary, in implementing a Multiple Disaster Plan.

2. **MULTIPLE DISASTER PROCEDURES FOR MOBILE RESOURCES.** If a Multiple Disaster occurs, then the following procedures shall be implemented with respect to Mobile Resources:

   (a) The first subscriber who declares a disaster, as determined by SunGard's receipt of written disaster declaration notices, shall have immediate and exclusive use of the applicable Mobile Resources.

   (b) If the applicable Mobile Resources are being used by another affected subscriber who previously declared a disaster, then Subscriber shall be provided immediate and exclusive use of other compatible Mobile Resources.

   (c) If all other compatible Mobile Resources also are being used by other affected subscribers who previously declared disasters, then Subscriber

shall be provided exclusive use of the first compatible Mobile Resources that become available.

   (d) Subscriber shall cooperate with SunGard and the other affected subscribers in coordinating the use of the Mobile Resources and in implementing any other plans for supporting the Multiple Disaster.

3. **MULTIPLE DISASTER PROTECTION.** To lower the probability of a Multiple Disaster, SunGard shall comply with the following terms:

   (a) **No other subscriber shall be granted any greater rights of access to or use of the Recovery Resources than are granted to Subscriber under this Agreement.**

   (b) **No agreement to provide use of any Recovery Resources shall be entered into at a time when the subscriber location to be serviced is then currently experiencing a disaster.**

For Center-Based Recovery Services, SunGard also shall comply with the following:

   (c) To discourage unnecessary disaster declarations, Disaster Declaration Fees, as provided in the Schedules, shall be charged whenever a subscriber declares a disaster.

   (d) To discourage unnecessary use of the Recovery Resources, Daily Usage Fees, as provided in the Schedules, shall be charged for actual use of the Recovery Resources other than for tests.

For each IBM mainframe Hotsite equal to or greater than Model 308X, SunGard also shall comply with the following:

   (e) **Agreements for the Hotsite shall not be entered into covering two subscriber computer facilities which are located in the same building.**

   (f) Agreements for the Hotsite shall not be entered into covering more than 110 subscriber computer facilities.

4. **CRISIS MANAGEMENT.** Whenever SunGard learns of an approaching storm or other situation that might cause a Multiple Disaster, SunGard shall monitor the situation and use commercially reasonable efforts to coordinate contingency plans with all potentially affected subscribers.

3

1. **CONTRACT TERM.** This Agreement shall continue in effect for so long as there is a Schedule in effect. A Schedule, and Subscriber's rights to use the Recovery Services selected on that Schedule, shall begin on the Commencement Date and continue in effect for the Agreed Term stated in that Schedule. Thereafter, that Schedule shall automatically renew for successive renewal terms of equal duration to the Agreed Term, unless either party gives written notice of termination to the other at least six months before the end of the then current term. Subscriber acknowledges that SunGard requires this advance notice due to the substantial, long-term equipment and facilities commitments SunGard makes in reliance upon its subscriber contracts. This Agreement and each Schedule is a non-cancelable contract that may be terminated only in accordance with its express terms.

2. **FEES AND EXPENSES.** All Monthly Fees shall be invoiced by SunGard in advance. All other fees, and any out-of-pocket expenses reasonably incurred by SunGard on behalf of Subscriber and with prior authorization, shall be invoiced by SunGard as and when incurred. Subscriber's payments shall be due within 30 days after receipt of invoice. Subscriber shall be responsible for (a) any applicable Disaster Fees as indicated on a Schedule, (b) all communications and similar third party charges resulting from Subscriber's use of the Recovery Resources, (c) all power, fuel and other utility charges resulting from Subscriber's use of the Recovery Resources, except the initial six weeks of Hotsite use and except for Tests, (d) all costs associated with the transportation, delivery, operation and ongoing support of Mobile Resources used by Subscriber, (e) all costs associated with the installation and de-installation of Mobile Resources used by Subscriber at non-SunGard locations, and (f) any sales, use, excise or comparable taxes assessed or imposed upon the services provided or the amounts charged under this Agreement. Beginning one year after the Commencement Date of a Schedule, SunGard may increase all fees chargeable under that Schedule by up to 8% per contract year, by giving Subscriber at least 90 days prior written notice.

3. **CONFIDENTIALITY.** All information disclosed by one party to the other in connection with this Agreement shall be treated as confidential information unless it is or becomes publicly available through no fault of the other party, is already known to the other party, or is later rightfully obtained by the other party from independent sources. Each party's confidential information shall be held in strict confidence by the other party, using the same standard of care as it uses to protect its own confidential information, and shall not be used or disclosed by the other party for any purpose except as necessary to implement or perform this Agreement. Without limiting the generality of the foregoing, such confidential information includes (a) Subscriber's data and software, and the details of Subscriber's computer operations and recovery procedures, which include trade secrets of Subscriber, (b) SunGard's physical security systems, access control systems, specialized recovery equipment and techniques, and User's Guides, which include trade secrets of SunGard, and (c) the terms of this Agreement. This Section D3 may be enforced by injunction.

4. **LIABILITY AND INDEMNIFICATION.** Each party ("liable party") shall be fully liable to the other party for any direct damages caused by any breach of contract, negligence or willful misconduct of the liable party (or any of its employees or agents) in connection with the use of the Recovery Resources or any other matter relating to this Agreement. The liable party shall indemnify and hold harmless the other party (and its affiliates and their respective employees and agents) against any claims, actions, damages, losses or liabilities to the extent arising from any such breach of contract, negligence or willful misconduct of the liable party (or any of its employees or agents). Notwithstanding the foregoing, SunGard shall have no liability for any of Subscriber's property located at a SunGard facility or in a SunGard vehicle, except for any direct damages caused by SunGard's gross negligence or willful misconduct. Subscriber shall indemnify and hold harmless SunGard (and its affiliates and their respective employees and agents) against any claims, actions, damages, losses or liabilities to the extent arising from the use, control or possession of any Mobile Resources by Subscriber (or any of its employees or agents). Excluding Subscriber's payment obligations, under no circumstances shall either party be liable for lost revenues, lost profits, loss of business, or consequential or special damages of any nature, whether or not foreseeable.

EXCEPT AS SPECIFICALLY STATED IN THIS AGREEMENT, SUNGARD MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR CONFORMITY TO ANY REPRESENTATION OR DESCRIPTION.

be considered in breach of this Agreement due to, any failure to perform ... either party shall be ... nor shall either party ... this Agreement ... of ... of a cause beyond its control, including any natural calamity, act of God or a public enemy, act of any military, civil or regulatory authority, change in any law or regulation, disruption or outage of communications, power or other utility, failure to perform by any supplier or other third party, or other cause which could not have been prevented with reasonable care. If, due to any such cause, SunGard is unable to provide to Subscriber a material part of the Recovery Services described in a Schedule and this inability continues for a period of more than 30 days, then the Monthly Fees for those Recovery Services for that period shall be waived and the term of that Schedule shall be extended by an equal period. If this inability continues for more than five days after Subscriber has declared a Disaster, then Subscriber may terminate that Schedule, without penalty, by giving written notice of termination to SunGard at any time before the inability ends.

6. **TERMINATION FOR CAUSE.** If either party breaches any of its obligations under this Agreement in any material respect and the breach is not substantially cured within the cure period specified below, then the other party may terminate this Agreement or any Schedule(s), without penalty, by giving written notice to the breaching party at any time before the breach is substantially cured. With respect to a breach of SunGard's obligation to provide the Recovery Services to Subscriber during a Disaster, the cure period shall be five days. With respect to Subscriber's payment obligations, the cure period shall be ten days after receipt of SunGard's written notice of non-payment. With respect to all other obligations under this Agreement, the cure period shall be 30 days after receipt of written notice describing the breach, provided that, if a longer period is reasonably required to cure the breach and the cure is promptly begun, such cure period shall be extended for as long as the cure is being diligently prosecuted to completion.

7. **NOTICE.** All notices, consents and other communications under this Agreement shall be in writing and shall be deemed to have been received on the earlier of the date of actual receipt or the third business day after being sent by first class mail. Any notice may be given by facsimile, and Disaster declaration notice may be given orally, provided that, in either case, a signed written confirmation is received within 24 hours thereafter. Subscriber's address for notice is stated in each Schedule. SunGard's address for notice is 1285 Drummers Lane, Wayne, Pennsylvania, 19087, Attention: Contract Administration.

8. **ENTIRE UNDERSTANDING.** This Agreement (which includes and incorporates all Schedules and Addenda to this Agreement) states the entire understanding between the parties with respect to its subject matter, and supersedes all prior proposals, negotiations and other written or oral communications between the parties with respect to the subject matter of this Agreement. No modification of this Agreement, and no waiver of any breach of this Agreement, shall be effective unless in writing and signed by an authorized representative of the party against whom enforcement is sought. No waiver of any breach of this Agreement, and no course of dealing between the parties, shall be construed as a waiver of any subsequent breach of this Agreement.

9. **PARTIES IN INTEREST.** Neither party may assign this Agreement or any rights or obligations under this Agreement without the prior written consent of the other party which will not be unreasonably withheld. This Agreement shall bind, benefit and be enforceable by and against both parties and their respective successors and consented-to assigns. No third party shall be considered a beneficiary of this Agreement or entitled to any rights under this Agreement.

10. **CONSTRUCTION. THIS AGREEMENT SHALL BE GOVERNED BY SUBSTANTIVE PENNSYLVANIA LAW.** This choice of governing law shall not be considered determinative of the jurisdiction or venue of any action between the parties. In any action relating to this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and court costs from the other party. A determination that any term of this Agreement is invalid or unenforceable shall not affect the other terms of this Agreement. Section headings are for convenience of reference only and shall not affect the interpretation of this Agreement. The relationship between the parties created by this Agreement is that of independent contractors, and not partners, joint venturers or agents. Sections D3, D4 and D10 shall survive any termination of this Agreement.



°1999, SunGard Recovery Services Inc., all rights reserved (CPLS-199

| Selected Services: | Included Yes/No | Test Periods | Disaster Fees (only during a Disaster) | |
|---|---|---|---|---|
| | | | Declaration | Daily Usage |
| (a) Center-Based Recovery Services: | | | $25,000 | |
|   (i) Hotsite: | Yes | Eight (8) | | $20,000 |
|   (ii) Coldsite: | Yes | N/A | | $1,500 |
|   (iii) Office Space: | Yes | N/A | | |
|   (iv) Work Group Space: | Yes | Four (4) | $2,500 | $500 |
|   (v) MegaVoice (sm): | No | N/A | $0 | $0 |
| (b) Mobile Recovery Services: | | | | |
|   (i) Replacement Recovery System: | Yes | Four (4) | $0 | $1,250 [1] |
|     Delivery Method(s) Selected: | Primary Recovery Facility/Alternate Recovery Facility | | | |
|   (ii) Computer Space: | No | N/A | $0 | $0 |
|     Delivery Method(s) Selected: | N/A | | | |
|   (iii) Supplemental Office Space: | No | N/A | | |
|   (iv) Mobile Work Group Space: | No | N/A | $0 | $0 |
|   (v) Quick Ship Equipment: | No | N/A | $0 | $0 |

[1] Initial 30 days of Daily Usage Fees during a Disaster will not be charged.

| Agreed Term: 63 month(s) | *Monthly Fee 5/15/99 to 5/31/00 Effective 05/15/1999 | $0 |
|---|---|---|
| Commencement Date: 05/15/1999 | *Monthly Fee 6/1/00 to 7/31/01 Effective 06/01/2000 | $1,000 |
| | *Monthly Fee 8/1/01 to 7/31/02 Effective 08/01/2001 | $10,400 |
| | *Monthly Fee 8/1/02 to 7/31/03 Effective 08/01/2002 | $10,970 |
| | *Monthly Fee 8/1/03 to 8/15/04 Effective 08/01/2003 | $11,570 |

\* The last sentence of Section D2 shall not apply to the fees
stated on this Schedule for the initial Agreed Term.

Subscriber's Location:    2729 PROSPECT PARK DRIVE, RANCHO CORDOVA, CA 95670

Send Subscriber Notices to:    100 FIRST STREET, SUITE 2100, SAN FRANCISCO, CA 94105

                        ATTN: FRED SMITH

Send Subscriber Invoices to:    100 FIRST STREET, SUITE 2100, SAN FRANCISCO, CA 94105

                        ATTN: FRED SMITH

THIS IS A YEAR 2000 READINESS DISCLOSURE MADE PURSUANT TO THE TERMS AND PROTECTIONS OF THE YEAR 2000 INFORMATION AND READINESS DISCLOSURE ACT. THE MANUFACTURER(S) OF CERTAIN OF THE COMPONENTS SPECIFIED ON THIS SCHEDULE HAS/HAVE ISSUED PUBLIC STATEMENTS REGARDING THE YEAR 2000 COMPLIANCE STATUS OF THE COMPONENTS. SOME MANUFACTURERS HAVE INDICATED THAT CERTAIN OF THEIR PRODUCTS WILL NOT BE YEAR 2000 COMPLIANT. SUNGARD IS NOT THE MANUFACTURER, DEVELOPER, OR DISTRIBUTOR OF THE COMPONENTS AND, WITH RESPECT TO THE YEAR 2000, MAKES NO REPRESENTATIONS OR WARRANTIES REGARDING THE COMPONENTS. IN THAT REGARD, YOU SHOULD CONTACT THE MANUFACTURER(S) OF THE COMPONENTS IN ORDER TO ASCERTAIN THE YEAR 2000 STATUS. IN ADDITION, YOU MAY REFER TO SUNGARD'S WEB PAGE AT http://recovery.sungard.com FOR LINKS TO THE VARIOUS MANUFACTURERS' SITES REGARDING THE YEAR 2000 AND THE STATUS OF THE COMPONENTS.

By the signatures of their duly authorized representatives below, SunGard and Subscriber, intending to be legally bound, agree to all of the provisions of this Schedule and ratify the terms of the Recovery Services Agreement.

| SUNGARD RECOVERY SERVICES INC. | SUBSCRIBER: DELTANET, INC. |
|---|---|
| BY: | BY: |
| PRINT NAME: JESSE B. ADAMS | PRINT NAME: Bill Thomas |
| PRINT TITLE: SR. VICE PRESIDENT | PRINT TITLE: VP |
| DATE SIGNED: 5/3/99 | DATE SIGNED: 5/20/99 |

THE TERMS OF THIS SCHEDULE ARE CONFIDENTIAL.
Quote ID 4693 A, Last Modified 05/19/1999

**Hotsite Configuration:**

| Quantity | Description |
|---|---|
| 1 | IBM 9672 OR EQUIVALENT  (226 - 390 MIPS) |
| 300 | MIPS |
| 2048 | MB OF STORAGE |
| 1726 | GIGABYTES OF 3390-3 DASD |
| 2 | IBM 3420 MAGNETIC TAPE DRIVE ADDRESSES |
| 4 | IBM 3480 MAGNETIC CARTRIDGE DRIVE ADDRESSES |
| 64 | IBM 3490E MAGNETIC CARTRIDGE DRIVE ADDRESSES |
| 20 | IBM 3590 MAGSTAR ADDRESSES |
| 1 | IBM 3800-3 PRINTING SUBSYSTEM   (SHARED RESOURCE) |
| 1 | IBM 3900-1 ADVANCED FUNCTION PRINTER   (SHARED RESOURCE) |
| 2 | IBM 4248 IMPACT LINE PRINTER |
| 1 | IBM 3745 MODEL 310 COMMUNICATION CONTROLLER |

1 configured as follows:

| | |
|---|---|
| 1 | AUTO-CALL |
| 1 | BUS/TAG ADAPTERS |
| 1 | HIGH SPEED SCANNER |
| 14 | LIC1  (RS232) |
| 2 | LIC3  (V.35) |
| 1 | TIC2 |

| Quantity | Description |
|---|---|
| 2 | IBM 3X74 LOCAL CLUSTER CONTROLLER  (INCLUDES TERMINALS & LINE PRINTER) |
| 1 | CISCO 7513 ROUTER BASE UNIT #2 |

1 configured as follows:

| | |
|---|---|
| 1 | ESCON CIP PORT |
| 1 | ETHERNET PORT |
| 1 | SERIAL PORT |
| 2 | T1/PRI PORT |
| 1 | TOKEN RING PORT |

| Quantity | Description |
|---|---|
| 1 | CISCO CATALYST 2924 ETHERNET SWITCH |
| 2 | ISDN PRI ACCESS |
| 4 | FLOOR SPACE, PRICE PER SQUARE FOOT |
| 1 | IBM 8228 TOKEN RING MAU, (8) PORT, TYPE 1 |
| 1 | NCC ACCESS |
| 1 | STORAGE CABINET |

**Work Group Configuration:**

| Quantity | Description |
|---|---|
| 1 | 3490 TAPE DRIVE W/4 DRIVES, IDRC |
| 1 | 3174-1L, 16 PORTS |
| 1 | 3174-1R, 16 PORTS, RS232 WITH MODEM |
| 1 | 3174-1R, 32 PORTS, RS232 WITH MODEM |
| 1 | CHANNEL EXTENSION UNIT |
| 1 | 4248 LINE PRINTER |
| 1 | METROCENTER FACILITY ACCESS |
| 4 | 3192 COMPATIBLE TERMINALS |
| 10 | 3192 COMPATIBLE TERMINALS, COLOR |

Initials
SunGard   Subscriber

THE TERMS OF THIS SCHEDULE ARE CONFIDENTIAL.
Quote ID 4693 A, Last Modified 05/19/1999

| | Quantity | Description |
|---|---|---|
| **Work Group Configuration:** | 25 | 3270 TERMINALS |
| | 1 | ACCESS TO COPIER AND FACSIMILE |
| | 58 | FURNISHED WORK POSITION, WIRED, PHONE HANDSET |
| | 2 | METROCENTER ON-SITE TEST SUPPORT PER TEST PERIOD |
| | 58 | VOICE GRADE LINES, DIRECT DIAL |
| | 3 | WIRING HUB, ETHERNET PORTS (10MB) |

| | Quantity | Description |
|---|---|---|
| **Mobile Configuration:**<br>(Cust Ref: Server, PCs at San Ramon MetroCenter) | 2 | COMPAQ DESKPRO, VGA MONITOR, CDROM |

2 configured as follows:

| | |
|---|---|
| 1 | 5/120 CPU |
| 32 | MB RAM |
| 1 | ETHERNET NIC |
| 1 | GB DISK |

1    COMPAQ PROLIANT 5000, VGA MONITOR, CDROM

1 configured as follows:

| | |
|---|---|
| 1 | PP/200 CPU |
| 128 | MB RAM |
| 1 | ETHERNET NIC |
| 12 | GB DISK |

| Quantity | Description |
|---|---|
| 1 | HP LASER JET 5 SI MX |
| 2 | CODEX 3262 V.32 MODEMS, QUICK SHIP |

Initials
SunGard Subscriber

THE TERMS OF THIS SCHEDULE ARE CONFIDENTIAL.
Quote ID 4693 A, Last Modified 05/19/1999

# ADDENDUM TO SCHEDULE A GOVERNED BY
## RECOVERY SERVICES AGREEMENT DATED MAY 15, 1999
### BETWEEN SUNGARD RECOVERY SERVICES INC. & DELTANET, INC.
#### Page 1 of 2

The Recovery Services Agreement, having the above Subscriber execution date, between SunGard Recovery Services Inc. ("SunGard") and the Subscriber named below, ("Agreement"), with regard to the Schedule identified above ("Specified Schedule") is amended effective ___May 15, 1999___, as follows:

1.  If Subscriber develops internally or acquires through a merger or acquisition its own internal backup facility (as defined below), then Subscriber may cancel a Schedule to this Agreement, effective at the end of the then current contract year or at the end of the next contract year, by giving written notice of cancellation to SunGard accompanied by payment of the cancellation fee described below. Subscriber's cancellation notice must describe, in reasonable detail, the internal backup facility that Subscriber has developed or acquired and must state the date on which such facility became operational (as described below). Subscriber's cancellation notice and payment must be received by SunGard at least 90 days before the effective date of cancellation. A "contract year" is any 12-month period beginning on the Commencement Date or any anniversary of the Commencement Date.

    An "internal backup facility" is a separate computer facility that is available to backup Subscriber's Location covered under a Schedule which includes an installed, fully operational, computer system substantially the same as or better than the Recovery Services then provided by SunGard under that Schedule. Subscriber's internal backup facility shall be considered "operational" at such time as Subscriber has completed a successful test of its ability to use that facility.

    The cancellation fee shall equal the product of the then current Monthly Fee payable under the affected Schedule, times the number of months between the Commencement Date (or most recent renewal date) and the effective date of cancellation under this provision, times the number of months remaining between the effective date of cancellation under this provision and the date the Schedule otherwise would have expired, times 0.834% (0.00834). This cancellation fee represents agreed-to liquidated damages and not a penalty.

    The right of cancellation granted under this provision may not be exercised during the first 36 months of the Agreed Term. This foregoing 36-month limitation shall be applicable during only the initial Agreed Term and not during any renewal term.

2.  At anytime during the initial Agreed Term of the Schedule, except if Subscriber is then experiencing a Disaster, Subscriber may elect to contract for additional Recovery Services (which are installed as part of SunGard's inventory at the time of such election) in accordance with the following price matrix. Such additional Recovery Services will be available to Subscriber effective upon the execution of an Addendum to the Specified Schedule defining such additional Recovery Resources:

| Description | 5/15/99 to 5/31/00 | 6/1/00 to 7/31/01 | 8/1/01 to 7/31/02 | 8/1/02 to 7/31/03 | 8/1/03 to 8/14/04 |
|---|---|---|---|---|---|
| Each H5 or 9672 Mainframe MIP | $14.00 | $13.30 | $12.60 | $12.00 | $11.40 |
| Each Additional Gigabyte of DASD | $4.00 | $3.80 | $3.60 | $3.40 | $3.20 |
| Each Additional 3480 or 3490E Tape Drive | $10.00 | $9.50 | $9.00 | $8.50 | $8.00 |
| Each Additional 3590 Tape Drive | $16.00 | $15.00 | $14.25 | $13.50 | $12.75 |
| Each Additional T-1 Access | $40.00 | $38.00 | $36.00 | $34.00 | $32.00 |
| Each Additional ISDN BRI Access | $10.00 | $9.50 | $9.00 | $8.50 | $8.00 |
| Each Additional CSU/DSU | $10.00 | $9.50 | $9.00 | $8.50 | $8.00 |

Initials

THE TERMS OF THIS ADDENDUM ARE CONFIDENTIAL

# ADDENDUM TO SCHEDULE A GOVERNED BY
## RECOVERY SERVICES AGREEMENT DATED MAY 15, 1999
## BETWEEN SUNGARD RECOVERY SERVICES INC. & DELTANET, INC.
### Page 2 of 2

The term of this Addendum shall continue until the end of the initial Agreed Term or any extended or renewal term of Specified Schedule.

By the signatures of their duly authorized representatives below, SunGard and Subscriber, intending to be legally bound, agree to all of the provisions of this Addendum and ratify the terms of the Agreement.

| SUNGARD RECOVERY SERVICES INC. | SUBSCRIBER: DELTANET, INC. |
|---|---|
| By: | By: |
| Print: Jesse B. Adams | Print: Bill Thomas |
| Print Title: Senior Vice President | Print Title: VP |
| Date Signed: 5/3, 99 | Date Signed: 5/20/99 |

THE TERMS OF THIS ADDENDUM ARE CONFIDENTIAL

# ADDENDUM FOR SUNGARD NATIONAL NETWORK SERVICES
## TO SCHEDULE A GOVERNED BY
## RECOVERY SERVICES AGREEMENT DATED MAY 15, 1999
## BETWEEN SUNGARD RECOVERY SERVICES INC. & DELTANET, INC.
### (See Additional Terms on Reverse Side)

The SunGard Recovery Services Agreement, having the above date, between SunGard and the Subscriber named below ("Agreement"), is hereby amended with regard to the Schedule identified above ("Specified Schedule"), consistent with the terms and conditions of the Agreement, as follows, effective May 15, 1999.  Subscriber has elected for SunGard to provide the Network and Internet Access Services ("Services") selected below:

| A. NETWORK SERVICES | QUANTITY | TOTAL MONTHLY FEE |
|---|---|---|
| **Dedicated:** | | |
| ☐  DS-1 Connectivity | N/A | |
|      (Destination Point     ) | | |
| ☐  DS-3 Connectivity | N/A | |
|      (Destination Point     ) | | |
| | | |
| **On-Demand:** | | |
| ☒  DS-1 Connectivity | 1 | 5/15/99 to 5/31/00:  $0 |
|      (Destination Point SunGard San Ramon Facility to SunGard Philadelphia Facility) | | 6/1/00 to 8/15/04: $1,000 |
| ☐  DS-3 Connectivity | N/A | |
|      (Destination Point     ) | | |
| ☐  DS-1 Metropolitan Connectivity | N/A | |
|      (Destination Point     ) | | |
| ☐  DS-3 Metropolitan Connectivity | N/A | |
|      (Destination Point     ) | | |

*Unless the following section is completed, indicating that SunGard is responsible for providing the connection(s) between Subscriber's location(s) and the designated point of presence on the National Network ("Local Access"), Subscriber is solely responsible for establishing the connection between Subscriber's location(s) and the designated point of presence on SunGard's National Network through its Local Exchange Provider. Once the Local Access has been established, Subscriber is responsible for contacting SunGard, to obtain the necessary facility assignment information to connect the Local Access to the SunGard National Network Node.*

| National Network Access: | | |
|---|---|---|
| ☐  DS-1 Access | N/A | |
|      (Subscriber Access Point     ) | | |
| ☐  DS-3 Access | N/A | |
|      (Subscriber Access Point  .  ) | | |

## B. INTERNET ACCESS SERVICES
**Recovery Based Internet Access**:

| | | |
|---|---|---|
| ☐  N/A Internet Connectivity | N/A | |
|      (Destination Point     ) | | |
| ☐  N/A Internet Connectivity | N/A | |
|      (Destination Point     ) | | |

Subscriber will be invoiced an additional Monthly Fee of $1,000 (beginning June 1, 2000), plus any applicable tax, in accordance with the terms of the Agreement and this Addendum.  The term of this Addendum will commence upon the effective date noted above or the date of installation, whichever is later, and shall continue until the end of the initial Agreed Term for the Specified Schedule or any extended or renewal term of the Specified Schedule.  In addition, Subscriber is responsible for one-time installation charges in the amount of $0, which will be invoiced in accordance with the terms of the Agreement and this Addendum.

By the signatures of their duly authorized representatives below, SunGard and Subscriber, intending to be legally bound, agree to all of the provisions of this Addendum and ratify the terms of the Agreement.

SUNGARD RECOVERY SERVICES INC.                    SUBSCRIBER:  DELTANET, INC.

BY:  _____                      BY:  _____

PRINT NAME:  JESSE B. ADAMS                        PRINT NAME:  _Bill Thomas_

PRINT TITLE:  SR. VICE PRESIDENT                   PRINT TITLE:  VP

DATE SIGNED:  5/31/99                              DATE SIGNED:  5/20/99

### THE TERMS OF THIS ADDENDUM ARE CONFIDENTIAL.

A. **NETWORK SERVICES - Dedicated Services** The Network Services identified as "Dedicated" within this Addendum shall be made available to Subscriber on an exclusive, 24-hour, 7-day per week basis (excluding downtime attributable to routine and preventative maintenance). All Dedicated circuits will be connected between the National Network entry point, as designated and coordinated by SunGard ("point of presence"), and the Destination Point defined on the front page of this Addendum. Subscriber shall have access to these Services for Disaster Recovery Purposes, in accordance with SunGard's obligations as defined in the Agreement, and as further delineated in this Addendum. Any other use of the Services by Subscriber shall constitute a material breach of the Agreement for which SunGard may terminate the Agreement by providing five (5) days written notice.

For purposes of this Addendum, "Disaster Recovery Purposes" means any use of the Services by Subscriber: (i) while Subscriber is experiencing a Disaster; (ii) which connectivity facilitates Subscriber's recovery during a Disaster; (iii) to conduct a Test(s); or (iv) for electronic vaulting.

**On-Demand Services** The Network Services identified as "On-Demand" within this Addendum shall be made available to Subscriber within two (2) hours after receipt of a request from Subscriber, based on then current availability on SunGard's National Network, in accordance with the General Multiple Disaster Procedures in the Agreement. All On-Demand circuits will be connected between the National Network entry point, as designated and coordinated by SunGard ("point of presence"), and the Destination Point defined on the front page of this Addendum. Once Subscriber has been switched onto a circuit on the National Network, the Services will be available on a 24 hour, 7 days per week basis (excluding downtime attributable to routine and preventative maintenance). Subscriber shall have access to these Services for testing or Disaster purposes, consistent with SunGard's obligations as defined in the Agreement. Any other use of the Services by Subscriber shall constitute a material breach of the Agreement for which SunGard may terminate the Agreement by providing five (5) days written notice. During a Disaster, Subscriber shall have access to the number of circuits for the period of no more than six (6) weeks.

For DS-3 connectivity, a Disaster Declaration Fee of no less than $5,000 will be charged per occurrence, and for DS-1 connectivity, a Disaster Declaration Fee of no less than $2,500 will be charged per occurrence. If a Declaration Fee of equal or greater value is charged in association with the Specified Schedule, then the Declaration Fee for the National Network will be deemed included in such fee. Daily Usage Fees (per circuit during Disaster only) will be charged as follows:

| | |
|---|---|
| DS-1 Connectivity | $1,000 |
| DS-3 Connectivity | $5,000 |
| DS-1 Connectivity (Metropolitan) | $ 500 |
| DS-3 Connectivity (Metropolitan) | $1,000 |

**Metropolitan Connectivity** Subscriber's connectivity is limited to the Metropolitan Network which is defined on the front of this Addendum, and does not provide Subscriber with connectivity between Metropolitan Networks.

B. **INTERNET ACCESS SERVICES** General Internet Access Terms. SunGard's Internet Access Services will provide Subscriber with connectivity to the Internet through SunGard's Internet Access Services subject to the terms and conditions of the Agreement and this Addendum and fully licensed Internet software, if applicable. The Internet is not owned, operated, or managed by, or in any way affiliated with SunGard or any of SunGard's affiliates. The Internet is an international computer network of both Federal and non-Federal inter-operable packet switched data networks. SunGard cannot and will not guarantee that the Internet Access Services will provide Internet access that is sufficient to meet Subscriber's needs. Subscriber agrees that its use of the Internet Access Service and the Internet is solely at its own risk and is subject to all applicable local, state, national and international laws and regulations.

Subscriber hereby acknowledges receipt of SunGard's and/or its underlying carriers' policies and/or rules and regulations ("Policies") and agrees to comply with such Policies at all times while utilizing the Internet Access Services. Subscriber also acknowledges that a breach of any of the Policies may result in the immediate termination of the Internet Access Services without prior notice and SunGard shall have no liability to Subscriber for any restriction or termination of the Internet Access Services pursuant to Subscriber's violation of the Policies. Subscriber agrees that the Access Service is provided on an "as is", "as available" basis without warranties of any kind, either express or implied. Subscriber agrees that SunGard has the right, but not the obligation, to remove content from SunGard's computer servers which SunGard, in its sole discretion, determines to be in violation of this

Agreement or SunGard's underlying carrier(s)' on-line policy.

**Recovery Based Internet Access** The Recovery Based Internet Access Services offer Subscriber access to the Internet from the SunGard facility designated on the front of this Addendum for Disaster Recovery Purposes. The Services shall be made available to Subscriber within two (2) hours after receipt of a request from Subscriber, based on then current availability on SunGard's National Network, in accordance with the General Multiple Disaster Procedures in the Agreement. Subscriber recognizes that these Services are not provider specific, therefore Subscriber is responsible for setting up any necessary domain(s) in order to facilitate effective use of the Recovery Based Internet Access Services. Subscriber shall have access to these Services for Disaster Recovery Purposes, in accordance with SunGard's obligations as defined in the Agreement, and as further delineated in this Addendum. Any other use of the Services by Subscriber shall constitute a material breach of the Agreement for which SunGard may terminate the Agreement by providing five (5) days written notice.

For .512 - 1.5 Mbps Recovery Based Internet Access Services, a Disaster Declaration Fee of no less than $500 will be charged per occurrence, and for 1.6 - 45 Mbps Internet Access, a Disaster Declaration Fee of no less than $5,000 will be charged per occurrence. If a Declaration Fee of equal or greater value is charged in association with the Specified Schedule, then the Declaration Fee for Recovery Based Internet Access Services will be deemed included in such fee. Daily Usage Fees (per bandwidth during Disaster only) will be charged as follows:

| | |
|---|---|
| .512 - 1.5 Mbps Internet Access | $ 250 |
| 1.6 - 10 Mbps Internet Access | $1,000 |
| 10.1 - 45 Mbps Internet Access | $2,000 |

**Testing** Subscriber shall have access to the Services to conduct Test(s) in conjunction with Test(s) of the Recovery Services as defined on the Specified Schedule.

**General** In the event that Subscriber does not contract with SunGard to establish the connection between Subscriber's Location and the point of presence on the National Network, Subscriber is then responsible to provide the resources to connect to SunGard's National Network from its Location to the designated point of presence.

**Termination** The Services are provided subject to the availability of the necessary services by SunGard's underlying carrier(s). SunGard may, without penalty, and by providing Subscriber with thirty (30) days prior written notice, terminate this Addendum (or any portion of this Addendum), or may withhold the provision of the Services if: (a) SunGard's underlying carrier(s) withdraw or substantially alter any underlying tariff(s) resulting in a material, adverse effect on SunGard's operational or financial ability to provide the Service(s); or (b) any public utility commission or other regulatory authority asserts jurisdiction over the Services, such that SunGard would be required to submit to common carrier, public utility or other regulation to which SunGard is not now subject.

**Limitation of Liability** UNDER NO CIRCUMSTANCES SHALL SUNGARD'S TOTAL LIABILITY EXCEED THE TOTAL OF ALL FEES ACTUALLY PAID BY SUBSCRIBER TO SUNGARD UNDER THIS ADDENDUM. SUNGARD SHALL HAVE NO LIABILITY FOR ANY DAMAGE TO, LOSS OF OR INTERCEPTION OR MISDIRECTION OF SUBSCRIBER'S DATA, FILES, SOFTWARE, CODE, OPERATING SYSTEMS, APPLICATIONS, DATA STORAGE MEDIA, OR OTHER PROPERTY THAT OCCURS DURING CONNECTION, TRANSMISSION, USE OR RESTORATION BY SUBSCRIBER OR SUNGARD IN CONJUNCTION WITH THE SERVICES. Subscriber shall indemnify and hold harmless SunGard (and its affiliates and their respective employees and agents) against any claims, actions, damages, losses or liabilities arising out of any action brought against SunGard by a third party as a result of Subscriber's use of the Services. Under no circumstances shall SunGard be liable to Subscriber or any other third party for lost revenues, lost profits, loss of business, or consequential or special damages of any nature, whether or no foreseeable.

EXCEPT AS SPECIFICALLY STATED IN THIS ADDENDUM, SUNGARD MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED INCLUDING WITHOUT LIMITATION ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OF CONFORMITY TO ANY REPRESENTATION OR DESCRIPTION.

# ADDENDUM TO
## RECOVERY SERVICES AGREEMENT DATED MAY 15, 1999

The Recovery Services Agreement, having the above date, between SunGard Recovery Services Inc. ("SunGard") and the Subscriber named below, ("Agreement"), is amended as follows:

1.    Section D1 <u>Contract Term</u> is amended by deleting the third sentence in the section and replacing it with the following:

"Thereafter, that Schedule shall automatically renew for successive one-year renewal terms at the then current one-year rate, unless either party gives written notice of termination to the other at least ninety (90) days before the end of the then current term."

2.    Section D5 <u>Force Majeure</u> is amended by deleting the words "five days" in the last sentence of the section and replacing them with the words "three (3) days".

3.    Subscriber shall have the right to extend the benefits of this Agreement to its Affiliates provided that those entities agree to be bound by the terms and conditions hereof. Notwithstanding the foregoing, agreements for Hotsite (for each IBM mainframe Hotsite equal to or greater than Model 308X) shall not be entered into covering two (2) subscriber computer facilities which are located in the same building. Each Affiliate that obtains Recovery Services hereunder shall be solely responsible for performing the duties and obligations imposed by this Agreement.

An "Affiliate" means any corporation, partnership, joint venture or other entity controlling, controlled by or under common control with Subscriber, directly or indirectly by or through one or more intermediaries.

4.    SunGard will provide a single point of contact to Subscriber out of its California offices and agrees to use all reasonable efforts to coordinate all marketing and contract activity through this point of contact. However, Subscriber recognizes that SunGard's organizational structure is such that territories are managed independently and locally.

By the signatures of their duly authorized representatives below, SunGard and Subscriber, intending to be legally bound, agree to all of the provisions of this Addendum and ratify the terms of the Agreement.

| SUNGARD RECOVERY SERVICES INC. | SUBSCRIBER: DELTANET, INC. |
|---|---|
| BY: | BY: |
| PRINT NAME: JESSE B. ADAMS | PRINT NAME: Bill Thomas |
| PRINT TITLE: SR. VICE PRESIDENT | PRINT TITLE: VP |
| DATE SIGNED: 5/31 , 19 99 | DATE SIGNED: 5/20/99 , 19 |

---

### THE TERMS OF THIS ADDENDUM ARE CONFIDENTIAL.

# RECOVERY SERVICES AGREEMENT DATED MAY 15, 1999

The Recovery Services Agreement, having the above date, between SunGard Recovery Services Inc. ("SunGard") and the Subscriber named below, ("Agreement"), is amended as follows:

1.  Section D1 Contract Term is amended by deleting the third sentence in the section and replacing it with the following:

    "Thereafter, that Schedule shall automatically renew for successive one-year renewal terms at the then current one-year rate, unless either party give written notice of termination to the other at least ninety (90) days before the end of the then current term."

2.  Section D5 Force Majeure is amended by deleting the words "five days" in the last sentence of the section and replacing them with the words "three (3) days".

3.  Subscriber shall have the right to extend the benefits of this Agreement to its Affiliates provided that those entities agree to be bound by the terms and conditions hereof. Notwithstanding the foregoing, agreements for Hotsite (for each IBM mainframe Hotsite equal to or greater than Model 308X) shall not be entered into covering two (2) subscriber computer facilities which are located in the same building. Each Affiliate that obtains Recovery Services hereunder shall be solely responsible for performing the duties and obligations imposed by this Agreement.

    An "Affiliate" means any corporation, partnership, joint venture or other entity controlling, controlled by or under common control with Subscriber, directly or indirectly by or through one or more intermediaries.

4.  SunGard will provide a single point of contact to Subscriber out of its California offices and agrees to use all reasonable efforts to coordinate all marketing and contract activity through this point of contact. However, Subscriber recognizes that SunGard's organizational structure is such that territories are managed independently and locally.

5.  The parties agree that the deletion of the word "pricing" in Section D3. "Confidentiality" is deemed null and void. Further, said Section D3 is amended by adding the following to the end of the section:

    "To the extent necessary to facilitate the use of this Agreement amongst entities within Subscriber's organization, Subscriber may disclose confidential information to such entities, provided that said entities are advised as to the confidential nature of the information being disclosed."

6.  This Addendum supersedes and replaces the prior Addendum to the Agreement, having a Subscriber execution date of May 20, 1999.

---

By the signatures of their duly authorized representatives below, SunGard and Subscriber, intending to be legally bound, agree to all of the provisions of this Addendum and ratify the terms of the Agreement.

SUNGARD RECOVERY SERVICES INC.

BY: _____

PRINT NAME: **JESSE B. ADAMS**

PRINT TITLE: **SR. VICE PRESIDENT**

DATE SIGNED: 6 / 10 / 99 , 19____

SUBSCRIBER: DELTANET, INC.

BY: _____

PRINT NAME: Bill Thomas

PRINT TITLE: VP

DATE SIGNED: 6/8/99 , 19____

---

**THE TERMS OF THIS ADDENDUM ARE CONFIDENTIAL.**

EXHIBIT B

**Deltanet, Inc.**

_00 First Street, Suite 2100_
_San Francisco, California 94105_
_(415) 995-8700_
_FAX (415) 974-8699_

May 30, 1999

Contract Administration
SunGard Recovery Services
1285 Drummers Lane
Wayne, Pennsylvania 19087

In accordance with Section D (Other Terms), for the Recovery Services Agreement between
SunGard Recovery Services Inc. and Deltanet Inc., dated May 15, 1999, Deltanet hereby
notifies SunGard Recovery Services that this agreement is terminated for cause as of July
31, 2000.

Deltanet has experienced significant problems with the timely delivery of equipment.
(Schedule A to the master agreement and the Network Services Addendum to schedule A
specifically identify the equipment and test periods for Deltanet .) These problems have
caused Deltanet a loss of technical resource hours and resulted in costs for the logistics of
supporting recovery exercises at the San Ramon SunGard facility. In addition Deltanet has
incurred damage to their ability to market its claims processing product because the Deltanet
client perceives that SunGard cannot recovery the clients application systems.

On May 21, 1999, Deltanet performed a recovery exercise with SunGard to validate the
ability of SunGard to provide recovery services. The recovery equipment was not received in
accordance with Deltanet's test time window. It was not received until 2 and ½ hours after
the start of the test. SunGard indicated this was an abnormally and that the equipment
would be ready at the next recovery test.

On June 6, 1999, Deltanet performed its second recovery exercise with SunGard. Again the
recovery equipment was not received in accordance with Deltanet's test time window. It was
not received until 4 and ½ hours after the start of the test. This delay put one of Deltanet's
client contracts at risk (the Delta Dental contract with the State of California). Deltanet
issued a formal statement to SunGard asking that they remedy the problem. On August 18th,
Deltanet representatives met with the Senior V. P. of Marketing in Sacramento, California to
express their dissatisfaction with the inability of SunGard to deliver equipment as per the
Recovery Services Agreement.

On December 7, 1999, SunGard provided identified three processes that it would follow to
ensure that Deltanet would receive the equipment in a timely manner and in accordance with
the Recovery Services Agreement. They were: Configuration Checklist; Escalation
Procedures; and Test Plan Development. Deltanet provided time and labor to support these
SunGard processes.

On May 19, 2000, Deltanet performed its third recovery exercise with SunGard.  This time the recovery equipment was not received, in accordance with Deltanet test time window, for 17 and ½ hours after the start of the test.  Partial equipment was received 5 and ½ hours after the start of the test, which allowed Deltanet personnel to begin a reduced level of recovery activity; however, many complete break downs of this reduced level of recovery occurred though out the test time period.

Again, Deltanet, in accordance with our agreement, is notifying SunGard of a causal effect that has rendered our agreement breached.  Deltanet has waited for a considerable time for SunGard to cure this breach and SunGard has been unable to do so.  As of July 31, 2000, Deltanet understands that this Recovery Services Agreement is null and void.

Sincerely,

John Hoebeke
Vice President and Chief Financial Officer
Deltanet, Inc.


CC:    Doug O'Brien (SunGard)
       Fred Smith (Deltanet)


Deltanet, Inc.

# FedEx USAirbill 8203 8226 6527 0215

**1 From** This portion can be removed for Recipient's records.

Date

FedEx Tracking Number 82038226527

Sender's Name _____ Phone 415 775-3700

Company RELIANET II?

Address 160 1ST ST STE 710?

City SAN FRANCISCO State CA ZIP 94105

**2 Your Internal Billing Reference**

**3 To**

Recipient's Name _____ Phone _____

Company

Address

To "HOLD" at FedEx location, print FedEx address.

We cannot deliver to P.O. boxes or P.O. ZIP codes.

City State ZIP

**4a Express Package Service** *Packages up to 150 lbs.*

- [ ] FedEx Priority Overnight
- [ ] FedEx Standard Overnight
- [ ] FedEx First Overnight
- [ ] FedEx 2Day
- [ ] FedEx Express Saver

**4b Express Freight Service** *Packages over 150 lbs.*

- [ ] FedEx 1Day Freight
- [ ] FedEx 2Day Freight
- [ ] FedEx 3Day Freight

**5 Packaging**

- [x] FedEx Envelope/Letter
- [ ] FedEx Pak
- [ ] Other Pkg.

**6 Special Handling**

- [ ] SATURDAY Delivery
- [ ] SUNDAY Delivery
- [ ] HOLD Weekday
- [ ] HOLD Saturday

Does this shipment contain dangerous goods?

- [x] No
- [ ] Yes As per attached Shipper's Declaration
- [ ] Yes Shipper's Declaration not required
- [ ] Dry Ice

Cargo Aircraft Only

**7 Payment** Bill to:

- [ ] Sender
- [ ] Recipient
- [ ] Third Party
- [ ] Credit Card
- [ ] Cash/Check

Total Packages | Total Weight | Total Charges

**8 Release Signature** Sign to authorize delivery without obtaining a signature.

Questions? Call 1-800-Go-FedEx (800-463-3339)

359

8203 8226 6527



FedEx

emp# 132885 09JUN00     ** 2DAY **     TUE

TRK# 8203 8226 6527 FORM 0215

Deliver By: 13JUN00  A1

19087 -PA-US     PHL

SF PNEA

Weight Limit: 8 Ounces

EXHIBIT C

SunGard
Recovery Services

1285 Drivers Lane
Norristown, PA 19403
(610) 341-8700  Tel
(800) 523-4970

June 26, 2000

Mr. John Hoebeke
Vice President and Chief Financial Officer
DELTANET, INC.
100 First Street, Suite 2100
San Francisco, CA  94105

Dear Mr. Hoebeke:

I am in receipt of your letter dated May 30, 2000 regarding the Recovery Services Agreement dated May 15, 1999 between SunGard Recovery Services Inc. and Deltanet, Inc. (the "Agreement"). SunGard is not in agreement with your contention that SunGard has breached its obligations under the Agreement and, therefore, does not accept your request to terminate the Agreement effective July 31, 2000.

SunGard arranged for Deltanet, Inc, to conduct its Tests of the Recovery Services remotely from SunGard's San Ramon recovery center.   The Network Services defined on the Addendum for SunGard National Network Services to Schedule A to the Agreement provided the connectivity from SunGard's San Ramon recovery facility to SunGard's Philadelphia MegaCenter.

Your letter states that, on a number of occasions, "recovery equipment was not received in accordance with Deltanet's test time window." The Tests were to be conducted remotely, which does not require shipment of any equipment to the San Ramon facility. All of the contracted Recovery Resources were available, in SunGard's Philadelphia MegaCenter, at all times during the Tests.   One problem with the Tests was a result of the network lines being down, resulting in difficulty in providing connectivity from San Ramon to the equipment in SunGard's Philadelphia MegaCenter.   As the network lines are provided by a third party carrier, it was not within SunGard's control to resolve this problem completely and provide the necessary connectivity to DeltaNet. Further, some of the channel extension equipment being used was not functioning properly, although the equipment is continuously maintained under a maintenance agreement, resulting in further difficulty in securing a network connection. In an effort to avoid this problem, SunGard offered use of our PCROC equipment, which is resident in San Ramon.   However, DeltaNet declined usage of this alternative solution. As stated in section D5, Force Majeure, of the Agreement, the failure to perform by any supplier or other party is a force majeure event, for which SunGard is not liable.

SunGard has gone to great lengths to resolve the problems, both during the Tests, and in December 1999, when SunGard created the three processes identified in your letter to help ensure that Deltanet's next Test would be successful. In addition, SunGard has provided extra test time at no cost to Deltanet in order to resolve the issue and help Deltanet to complete a successful Test. At all times, SunGard has been working diligently to help resolve the problems encountered during Deltanet's Tests, and will continue to do so until the problems are resolved to your reasonable satisfaction.

SunGard prefers to resolve this matter in an amicable business manner. It is SunGard's policy to be as flexible and accommodating as possible with its customers, while at the same time being extremely careful to protect the integrity of its contracts. If you have any questions or concerns, please contact Don O'Brien, Sr. Vice President of Sales, at 480-367-4124, or myself at 610-341-1505.

Sincerely,

Denise M. MacLeod
Director, Contract Administration - Legal

**SUNGARD°**